|   |   |   |
|---|---|---|
| 1 | | HONORABLE RONALD B. LEIGHTON |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LEONARD PELTIER, CHAUNCEY PELTIER,<br><br>                Plaintiffs,<br>   v.<br><br>JOEL SACKS, individually and in his capacity as DIRECTOR OF the WASHINGTON STATE DEPARTMENT OF LABOR AND INDUSTRIES; TIMOTHY CHURCH, individually and in his capacity as PUBLIC AFFAIRS MANAGER of the WASHINGTON STATE DEPARTMENT OF LABOR AND INDUSTRIES; JAY INSLEE, individually and in his capacity as GOVERNOR of the STATE of WASHINGTON,<br><br>                Defendant. | CASE NO. 17-5209 RBL<br><br>ORDER ON MOTION FOR SUMMARY JUDGMENT |

      THIS MATTER is before the Court on Defendants' Motion for Summary Judgment [Dkt. #42]. Plaintiff Leonard Peltier claims Defendants violated his first amendment rights when they prematurely removed four of his paintings from a Department of Labor and Industries exhibit promoting Native American heritage month. [Dkt. #1].

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 1

## I. BACKGROUND

Leonard Peltier is a Native American convicted of murdering two FBI agents and is serving a life sentence. Peltier has become an established painter during his more than 40 years in prison. Leonard Peltier's son, Chauncey[1], manages an art gallery featuring Leonard's paintings.

Defendant Timothy Church is the public affairs manager of the Washington State Department of Labor and Industries. Defendant Joel Sacks is the Director of L&I. Defendant Jay Inslee is the Governor of Washington.

In November 2015, L&I held a month-long Native American heritage event at its Tumwater office. Chauncey Peltier agreed to loan four of Leonard Peltier's paintings for the event, and the paintings were exhibited in the L&I building's rotunda.

Soon after exhibiting Peltier's art, L&I received at least three complaints from people upset that it was promoting an artist who had been convicted of murdering two FBI agents. Two of these complaints were from former FBI agents. L&I removed Peltier's paintings two weeks before the exhibit was over.

Leonard (and Chauncey) Peltier sued, claiming the removal violated Leonard's federal and Washington State constitutional rights. He also sued for intentional infliction of emotional distress and negligence.

Defendants seek summary judgment on all claims. They argue that the display was L&I's speech—not Peltier's—and the first amendment does not apply to government speech. [Dkt. 53 at 2]. Defendants Sacks and Inslee argue that Peltier's claims against them fail as a matter of law

---

[1] Leonard and Chauncey Peltier brought this action together; however, Chauncey does not claim that his first amendment rights were violated. The remainder of this section will thus refer to Leonard Peltier as a singular plaintiff. Chauncey Peltier has no standing to assert first amendment claims regarding his father's speech. To the extent he is doing so, his claims are **DISMISSED** with prejudice.

because they were not personally involved in removing Peltier's paintings. All Defendants argue that no reasonable jury would find that removing the paintings was outrageous, and that they did not intentionally inflict emotional distress on Peltier. They argue that Peltier's negligence claim fails because there is no tort duty sounding in negligence arising from the constitution. Defendants also argue that there is no private cause of action for violations of Washington's constitution.

Peltier argues that his paintings were his speech, not the government's. He argues that Sacks and Church took responsibility for removing the paintings, and that Inslee must have participated in the decision to remove them because he is the "highest decision-maker in the state." Peltier argues that Defendants acted with an "extreme attitude" toward his first amendment rights, and with "reckless disregard" for the emotional distress that censoring his art would cause. He argues that Defendants owed him a duty to not "trample on his first amendment rights," which should give rise to a negligence claim. Peltier concedes he has no private claim for money damages under the Washington constitution; he now seeks a (mandatory) injunction requiring L&I to display his paintings.

## II. LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986) *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable

factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III. DISCUSSION

**A.    First Amendment Claim**

Section 1983 affords plaintiffs a cause of action for constitutional violations on the part of local government bodies and other state officials. *Sintra, Inc. v. City of Seattle*, 131 Wash. 2d 640, 652, 935 P.2d 555, 562 (1997).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) the violation of the rights secured by the Constitution and laws of the United States, and (2) the deprivation was committed by a *person* acting under *color of state law*. *Parratt v. Taylor*, 452 U.S. 527, 535, 101 S. Ct. 108 (1981) (emphasis added). To be liable, the wrongdoer must personally *cause* the violation. *Leer v. Murphy*, 844. F.2d 628, 633 (9th Cir. 1988). There is no respondeat superior or

vicarious liability. *Polk County v. Dodson*, 454 U.S. 312 (1981). A supervisor may be liable under § 1983 only if he "participated in or directed the violation, or knew of the violation and failed to prevent it.

1. <u>The Native American heritage month event was not government speech</u>

Defendants first argue that the art exhibit was L&I's—the government'—speech, not Peltier's. They claim they decided what forms of art and which art to use in the display, not Peltier, and that his first amendment rights were not impacted by their decision to remove his paintings form their display. Peltier contends that the Native American heritage month event was a public event intended to promote the speech of Native American artists, and that Defendants infringed on his first amendment rights when they effectively censored his speech.[2]

The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). When the government sets the overall message and approves every word disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005).

While the government-speech doctrine is important—indeed, essential—it is susceptible to dangerous misuse. *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017). If private speech could be

---

[2] The Peltiers' complaint claims briefly that defendants violated their "property right and contracted opportunity" Due Process rights. They do not assert a breach of contract claim, and nothing in any of their subsequent filings addresses or supports any Due Process claim. On summary judgment, the moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case upon which it bears the burden of proof. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 requires the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256. The Peltiers have not done so on the Due Process claim they vaguely reference. If and to the extent they asserted such a claim, Defendants' Motion for Summary Judgment is **GRANTED** with respect to it, and that claim is **DISMISSED** with prejudice.

passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints. *Id.*

In determining whether the government speech doctrine applies to a given situation, the question is whether the government acted to facilitate private speech, or to promote its own message. *Johanns,* 544 U.S. at 553.

Defendants' argument that Peltier's paintings were government speech is based on *Pleasant Grove*. There, a City's refusal to include a religious group's artwork in a city monument did not violate the First Amendment because the monument was government speech. *See Pleasant Grove*, 555 U.S. 460. The monument consisted of several different art pieces relating to the history of the city, including some pieces that were donated by private citizens. Because the City set a clear "message" for the monument—the City's history—and erected it permanently in a public park, the monument was government speech. While government approval was an important factor in determining whether the government speech doctrine applied, it certainly was not the only factor. The overall focus in *Pleasant Grove* was on whether a reasonable observer would view the statement made to be a statement by the government. *See Eagle Point Educ. Ass'n v. Jackson Cty. Sch. Dist. No. 9*, 880 F.3d 1097, 1103 (9th Cir. 2018). In the context of a permanent monument at a public park there was little chance that observers would fail to appreciate the identity of the speaker. Thus, the monument was government speech as a matter of law. *Pleasant Grove,* 555 U.S. 460 at 471.

In this case, the identity of the speaker is not so clear. Promotional materials for the heritage month event advertised Peltier individually, encouraging onlookers to "come see art by the renowned Native American artist Leonard Peltier," and including a link to Peltier's website. Other materials for the event advertised Native American dance performances, story telling,

movie screenings, and discussions. A reasonable observer could have seen the event poster and believed that the speakers were the Native American artists that were listed and promoted individually. Likewise, an observer who saw the poster promoting Peltier's paintings certainly could have identified the intended speaker as Peltier. At the very least, it would not have been clear to an observer that Peltier's art exhibit, and other individually promoted performances, were actually L&I "speaking."

To the extent that government approval of speech supports a government speech defense, L&I simply could not have "effectively controlled" or "exercised final approval authority" over the entirety of speech disseminated during the Native American Heritage Month event. L&I certainly could not have controlled the speech within a discussion or a dance performance.

Viewed in the light most favorable to Peltier, the evidence supports a finding that L&I provided a forum for groups and individuals to exercise private speech. The Native American Heritage Month celebration was therefore not government speech. Thus, the extent to which the Government can control speech depends on the nature of the relevant forum.

Traditional public fora are those places which "by long tradition or by government fiat" have been devoted to assembly, debate, communicating thoughts between citizens, and discussing public questions. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 954-55 (1983). Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 790, 105 S. Ct. 3439, 3443 (1985). In addition to traditional public fora, a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly

and speech, for use by certain speakers, or for the discussion of certain subjects. *Id.* To create a designated public forum, the government must intend to grant "general access" to its property for expressive use, either by the general public or by a particular class of speakers. *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 497 (9th Cir. 2015). Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards that apply in a traditional public forum. *Perry,* 460 U.S. 37 at 46.

Defendants contend that the Native American heritage month event was actually intended to "educate L&I's employees in the Tumwater office." Other than the general observation that the majority of people who come to the L&I building on a given day are not members of the public, Defendants provide no evidence to suggest that the Native American heritage celebration was intended "mainly for L&I employees." In fact, the event poster that L&I distributed said, "join us at the following *public* events during the month of November to celebrate Native American heritage." Dkt. 52 Ex. 10 (emphasis added).

Viewed in the light most favorable to Peltier, the evidence supports the inference that the Native American heritage month event was a public forum designated for the celebration, education, and discussion of Native American heritage. Because L&I designated the forum for a certain subject, excluding speech or speakers that did not relate to Native American heritage would have been permissible. But Peltier's paintings depicting Native American culture, and his identity as a Native American, were well within the designated subject matter.

Thus, in the public forum it designated, L&I needed a compelling government interest to remove Peltier's paintings. Defendants contend that L&I removed the paintings because the public controversy they caused "detracted from L&I's overall message."

Freedom of speech, though not absolute, is protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. *Terminiello v. Chicago*, 337 U.S. 1, 2, 69 S. Ct. 894, 895 (1949). Appeasing those who disapprove of a speaker, or diffusing a controversy, are not compelling government interests. *See Cornelius,* 473 U.S. at 811 ("the avoidance of controversy is not a valid ground for restricting speech in a public forum.").

Even if the evidence supported a finding that the Native American heritage event was a limited public forum, removing Peltier's paintings would still not be permissible.[3]

A subject matter or speaker-based exclusion must meet two requirements to be permissible in a limited public forum. First, it must be "reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806. Second, exclusions must be based on a standard that is definite and objective. *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 499 (9th Cir. 2015). Standards for inclusion and exclusion in a limited public forum must be unambiguous if the concept of a designated public forum is to retain any vitality. *Hopper v. City of Pasco,* 241 F.3d 1067, 1074-75 (9th Cir. 2001) (quoting *Christ's Bride Ministries v. SEPTA*, 148 F.3d 242, 251 (3d Cir. 1998). Without express standards for government limitation of speech, the use of shifting or illegitimate criteria is far too easy. *Id* at 1080. The more subjective the standard used, the more likely that the category will not meet the requirements of the First Amendment. *Cinevision Corp. v. Burbank,* 745 F.2d 560, 565 (9th Cir. 1984).

---

[3] While some courts have used the terms "designated public forum" and "limited public forum" interchangeably, the Ninth Circuit distinguishes between the two terms. Limited public forum is a sub-category of a designated public forum that refers to a type of non-public forum that the government has intentionally opened to certain groups or to certain topics. *Hopper v. City of Pasco, 241 F.3d 1067, 1074-75 (9th Cir. 2001)*. In a limited public forum, restrictions that are reasonable in light of the purpose served by the forum are permissible. *Id.*

L&I's purported reasons for removing Peltier's paintings are particularly important. Defendants claim they removed Peltier's artwork once displaying it detracted from "L&I's message." There is no evidence that Defendants set objective criteria for including art or artists to begin with, however, other than the art relate to Native American heritage. Defendants initially found no reason to exclude Peltier's paintings from the Native American heritage month event, despite discussing the risk of controversy beforehand. Nor were Defendants concerned about the paintings during the first two weeks of the event. Defendants decided that Peltier's paintings conflicted with "L&I's message" only after receiving complaints, reaching out to those who complained, and "listening carefully to their thoughts and concerns." In other words, whether artwork fell within L&I's intended purpose of celebrating Native American heritage seemingly depended on the approval or disapproval of outside viewers. Enforcing the exclusion of artwork is intrinsically flawed when exclusion is contingent upon the subjective reaction of viewers of the artwork, as perceived by government officials. *Hopper,* 241 F.3d at 1077.

Here, L&I's only evident standard for inclusion, haphazardly imposed half way through the month-long exhibit, was that art or artist be non-controversial. The mere fact that the artwork causes controversy is, of course, patently insufficient to justify its suppression. *Id* at 1081. Removing Peltier's paintings was not reasonable in light of the forum's purpose, and thus not permissible. Accordingly, Peltier has provided evidence that, when viewed in the light most favorable to him, support the inference that Defendants violated his first amendment rights.

2. <u>Sacks and Church personally participated in removing the paintings</u>

Sacks argues that he is entitled to summary judgment because he did not personally participate in removing the paintings. Peltier points out that Sacks took personal responsibility for the decision to remove the paintings.

After L&I removed the paintings, Sacks explained to those who had complained: "we made the very difficult decision to rotate in other Native American art," and "we removed Leonard Peltier's paintings," indicating that he participated in the decision. Peltier has alleged facts that, when viewed in the light most favorable to him, support the inference that Sacks participated in the decision to remove Peltier's paintings.

Defendants incorrectly contend that in individual-capacity § 1983 lawsuits, plaintiffs are required to show that the officials "left their official roles behind and instead embarked on a course deliberately indifferent to plaintiffs' constitutional rights." Dkt. 42 at 11. There is no such requirement under § 1983. To establish personal liability under 1983, a plaintiff must show that the official, acting under color of state law, caused the deprivation of a federal right. *See Hafer,* 502 U.S. 21 at 22. State officials sued in their individual capacities are "persons" for purposes of § 1983. *Id.* The phrase "acting in their official capacities" is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury. *Id*.

3. <u>Inslee did not personally participate in removing the paintings</u>

While Peltier has alleged sufficient facts to demonstrate that Church and Sacks participated in removing Peltier's paintings, Peltier offers no evidence that Inslee participated at all in selecting or removing the paintings. Peltier contends that Inslee must have had at least some part in removing the paintings because as Governor of Washington, Inslee is "the highest decision-maker in the state." Dkt. 1 at 13. But there is no respondeat superior liability under § 1983. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91, 98 S. Ct. 2018 (1978).

Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** with respect to all Plaintiffs' claims against Defendant Jay Inslee in his individual capacity, and those claims are **DISMISSED WITH PREJUDICE**.

4. <u>Defendants are not entitled to qualified immunity</u>

Defendants Church and Sacks argue that even if they violated Peltier's rights by removing his art, they are nevertheless entitled to qualified immunity because the violation was not clearly established.[4]

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A two-part test resolves claims of qualified immunity by determining whether plaintiffs have alleged facts that "make out a violation of a constitutional right," and if so, whether the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 553 U.S. 223, 232 (2009).

Qualified immunity protects officials "who act in ways they reasonably believe to be lawful." *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011) (quoting *Anderson*, 483 U.S. at 631). The reasonableness inquiry is objective, evaluating 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Huff v. City of Burbank*, 632 F.3d 539, 549 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Even if the officer's decision is constitutionally deficient, qualified immunity shields him from suit if her

---

[4] Defendants also argue that they are entitled to qualified immunity because Peltier has not shown that Defendants acted with "deliberate indifference" to Peltier's constitutional rights. Defendants assert that the Court should grant their Motion for Summary Judgment on this ground alone. Seeing as no such "deliberate indifference" requirement exists under the qualified immunity doctrine, nor under § 1983, the Court need not address this argument.

misapprehension about the law applicable to the circumstances was reasonable. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Qualified immunity "gives ample room for mistaken judgments" and protects "all but the plainly incompetent." *Hunter v. Bryant*, 502 U.S. 224 (1991).

Ample precedent holds that that when the government designates a public forum for expressive activity, even if the government limits the activity to certain subjects, restricting certain speech is prohibited. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 38 (1983); *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 821 (1985); *Widmar v. Vincent*, 454 U.S. 263, 264 (1981).

Peltier correctly points to Supreme Court precedent holding that the first amendment prohibits restrictions that distinguish among different speakers and allow speech by some but not others. *Citizens United v. FEC*, 558 U.S. 310, 340, 130 S. Ct. 876, 898 (2010). By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. *Id* at 899.

Perhaps most established is that restricting speech because it causes controversy or offense is the very censorship the first amendment prohibits. *See FCC v. Pacifica Found.,* 438 U.S. 726, 729 (1978) ("The fact that society finds speech offensive is not a sufficient reason for suppressing it."); *Hopper,* 241 F.3d 1067 ("The mere fact that the artwork causes controversy is, of course, patently insufficient to justify its suppression.").

In *Hopper*, the Court specifically held that removing art from an exhibit at City Hall because the artwork sparked controversy violated artists' first amendment rights. The City had opened an art gallery within city hall and exhibited art done by local artists. Artists who were

ORDER ON MOTION FOR SUMMARY
JUDGMENT - 13

initially invited to display their work at the gallery were summarily uninvited when their submissions provoked controversy. *Hopper,* 241 F.3d 1067.

It was clearly established that in a public forum, Defendants needed a compelling government interest to remove or prohibit speech. It was also clearly established that in excluding certain art from the exhibit, Defendants had to establish definite and unambiguous criteria for inclusion in the first place, which they did not. A reasonable director of a state agency, and public affairs manager, respectively, would have known that removing art based solely on certain individuals' disapproval of a speaker's identity violated well-established first amendment principles.

Accordingly, Defendants are not entitled to qualified immunity.

5.  Peltier's "Official Capacity" claims are dismissed

Peltier sued Sacks, Church, and Inslee in both their "individual" and their "official" and capacities, but he did not sue the State. The reason for these choices is not clear.

Official-capacity suits are generally just another way of suing the state or agency that employs the agent. *Hafer v. Melo*, 502 U.S. 21, 22, 112 S. Ct. 358, 360 (1991). Suits against state officials in their official capacity therefore should be treated as suits against the state. *Id.* Typically, where the state is a defendant, naming an officer of the state in her official capacity is redundant, and "official capacity" claims against that officer are dismissed. *See Monell*, 436 U.S. 658. And to plead a claim against a municipality under § 1983, a plaintiff must show that the defendant's employees or agents acted pursuant to an official custom, pattern, or policy that violates the plaintiff's civil rights. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91, 98 S. Ct. 2018 (1978).

Peltier provides no evidence to suggest that Defendants decided to remove his paintings based on L&I's official custom, pattern, or policy. In fact, Peltier does not assert a *Monell* claim,

1  and does not mention a potential policy or custom at all; he simply contends that Defendants
2  each were part of the decision to remove the paintings. Accordingly, Defendants' Motion for
3  Summary Judgment on this point is **GRANTED,** and all of Plaintiff's "official capacity" claims
4  are **DISMISSED WITH PREJUDICE**.

### B. Intentional Infliction of Emotional Distress

Peltier alleges that removing his art was outrageous conduct, and that the Defendants knew or should have known that it would cause him emotional distress. Defendants argue that they were not malicious actors, and removing the paintings was not outrageous.

To prevail on a claim for the tort of outrage, (also known as the intentional infliction of emotional distress), a plaintiff must prove that (1) the defendant engaged in extreme and outrageous conduct, (2) the defendant intentionally or recklessly inflicted emotional distress on the plaintiff, and (3) the conduct actually resulted in severe emotional distress to the plaintiff. *Kloepfel v. Bokor*, 149 Wash.2d 192, 195, 66 P.3d 630 (2003). "Any claim of outrage must be predicated on behavior 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Sutton v Tacoma School District No. 10*, 180 Wash.App. 859, 324 P.3d 763 (2014) (internal citations omitted) (emphasis added). The question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability. *Dicomes v. State*, 113 Wash.2d 612, 614, 782 P.2d 1002, 1005 (1989).

Even viewed in the light most favorable to the Peltiers, Defendants' conduct does not meet the outrage standard. Removing art after receiving complaints about the artist is not extreme, atrocious, or utterly intolerable conduct, even if it violated Peltier's first amendment right.

Accordingly, Defendants' Motion for Summary Judgment on Peltier's Intentional Infliction of Emotional Distress claim is **GRANTED**, and that claim is **DISMISSED WITH PREJUDICE.**

C. **Negligence**

The Peltiers allege that Defendants were negligent in violating Leonard Peltier's federal and state constitutional rights. Specifically, Plaintiffs claim that Defendants had a "duty of reasonable care to not trample on Peltier's first amendment rights." Defendants argue that Plaintiffs have not established any duty to support a negligence claim.

To maintain an action for negligence under Washington law, a plaintiff must show (1) that the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, (3) the plaintiff was injured, and (4) the defendant's breach was the proximate cause of the injury. *Doty-Fielding v. Town of South Prarie,* 143 Wn. App. 559 (2008).

There is no support for the claim that a first amendment violation turns a constitutional violation into a negligence case. The Peltiers provide no evidence to support a negligence claim other than the conclusory allegation that Defendants "trampled on their duty of reasonable care and caused direct and foreseeable harm." Dkt. 51 at 23.

To the extent the Peltiers claim Defendants had a duty to not violate Leonard Peltier's state constitutional rights, Washington does not recognize a cause of action in tort for a violation of the constitution. *Blinka v. Wash. State bar Ass'n*, 109 Wash. App. 575, 578 (2001).

Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Negligence claim is **GRANTED**, and that claim is **DISMISSED WITH PREJUDICE.**

D. **Violation of Washington State Constitution**

The Peltiers contend that they suffered "general and special damages" as a result of Defendants violating Washington State constitutional rights to due process, peaceable assembly,

and freedom of speech. *See* Washington Constitution Art. I, § 3, 4, and 5. Defendants reiterate that Washington does not recognize a cause of action in tort for a violation of the constitution. The Peltiers now say that they will "accept a finding of violation and an order to rehang the paintings," which they apparently claim are permissible forms of relief. Dkt. 51 at 22.

Washington law contains no counterpart to 42 U.S.C. § 1983, which creates a civil cause of action for violations of the United States Constitution by persons acting under color of state law. *Sisley v. City of Seattle*, 179 Wash. App. 1021 (2014). Washington courts have consistently rejected invitations to establish a cause of action for damages based upon constitutional violations. *Blinka*, 109 Wash. App. at 578.

Washington Courts have also refused to recognize a cause of action for a constitutional violation when Plaintiffs may obtain adequate relief under the common law. *See Reid v. Pierce County*, 136 Wn.2d 195, 213-14 (1998) ("Plaintiffs have not presented a reasoned or principled basis upon which to construct a constitutional cause of action, nor have they established why a constitutional cause of action is more appropriate than the common law cause of action which already exists").

If the Peltiers wished to seek an order to re-hang his paintings for the remainder of the "contracted period"—essentially, a specific performance contract claim, they should have alleged breach of contract. The Peltiers cite no authority imposing a mandatory injunction to remedy a state constitutional violation, and they do not articulate why a constitutional cause of action is more appropriate than a breach of contract cause of action.

Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Washington Constitutional claim is **GRANTED**, and that claim is **DISMISSED WITH PREJUDICE.**

## IV. CONCLUSION

Defendants' Motion for Summary Judgment [Dkt. 42] is **GRANTED** with respect to Plaintiffs' fifth and fourteenth amendment, intentional infliction of emotional distress, negligence, and Washington constitutional claims. The motion is **GRANTED** with respect to Plaintiffs' § 1983 claim against Defendant Jay Inslee, and against all Defendants in their "official capacities." Plaintiff has raised a genuine issue of fact as to whether removing his paintings violated his first amendment rights, and Defendants are not entitled to qualified immunity. The motion is therefore **DENIED** with respect to Plaintiff's first amendment claim.

IT IS SO ORDERED.

Dated this 16th day of July, 2018.

Ronald B. Leighton
United States District Judge